**Affirmed and Memorandum Opinion filed December 7, 2023.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-23-00424-CV

---

**O.G.M., Appellant**

**V.**

**DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, Appellee**

---

**On Appeal from the 314th District Court
Harris County, Texas
Trial Court Cause No. 2021-01609J**

---

## MEMORANDUM OPINION

This accelerated appeal arises from a final order in which, after a final hearing tried to the bench,[1] the trial court terminated the parental rights of appellant O.G.M. (Mother) with respect to her son, J.G.,[2] and appointed appellee Department of Family and Protective Services (the Department) to be J.G.'s sole permanent

---

[1] We refer to the final hearing as the "trial."

[2] To protect the minor's identity, we do not use the actual names of the child, parents, or other family members. *See* Tex. R. App. P. 9.8.

managing conservator. *See* Tex. Fam. Code Ann. § 109.002(a-1) (accelerated appeals in parental-termination cases); Tex. R. App. P. 28.4 (same).[3]

In five issues, Mother argues: (1) she proved an affirmative defense under the Americans with Disabilities Act (ADA); (2) the evidence was legally and factually insufficient to support termination under subsection (E); (3) she proved an affirmative defense under section 161.001(d), precluding termination of her parental rights under subsection (O); (4) the evidence was factually insufficient to support the finding that termination was in J.G.'s best interest; and (5) the trial court abused its discretion by failing to appoint her as a possessory conservator. We affirm the final order of the trial court.

## I. BACKGROUND

According to the removal affidavit, in October 2021, law-enforcement officers responding to a call from a resident in a hotel complex found J.G., who was two-years old at the time, wandering alone in the hallway. The officers eventually traced J.G. to Mother's room. Because Mother did not answer the door, the officers entered the room and found mother in a deep sleep. Law enforcement referred the case to the Department over concerns for J.G.'s safety. Shortly afterward, Investigator D. Massie from the Department arrived at the hotel to speak with the officers.

Officer Garcia told Massie about his observations of "the mother's interactions with the child." Specifically, Garcia told Massie that "[Mother] picked up the child and tossed him onto a chair in the waiting area." Garcia also observed that Mother was not "engaging" with J.G. at all during the investigation and would

---

[3] The trial court also terminated the parental rights of J.G.'s alleged father, O.L. The trial court noted that O.L was not registered with the paternity registry and could not be contacted or located. O.L. has not appealed the termination of his rights.

2

occasionally jerk J.G. Additionally, aside from a single juice box, Garcia noted that the hotel room had no food, water, clothing, or diapers.

Massie then spoke with Mother. Mother initially denied using drugs or alcohol, having any mental-health issues, or being a victim of domestic violence. Mother acknowledged having a past Child Protective Services (CPS) case, but claimed it was only because she was depressed. Mother claimed to no longer be suffering from depression and reasserted that she had no mental-health issues. Mother informed Massie that she has two other children who are living with their biological fathers and grandparents. Mother further told Massie that she was unemployed and receiving SNAP (Supplemental Nutrition Assistance Program) and Medicaid benefits.

When questioned about J.G. wandering alone in the hotel, Mother explained that she had taken Nyquil because she was sick and under the impression that her friend who dropped her off at the hotel was going to stay and watch J.G. while she slept. However, Mother asserted the friend must have left during the night without warning. Mother's friend had paid for Mother to stay two nights at the hotel because she did not want Mother staying at her home any longer. Mother admitted that she had enough money to stay a few more nights but had no plans for when the money ran out. Mother told Massie that she has no family support and that J.G.'s father is not in their life.

Massie was concerned about several inconsistencies in Mother's account. First, while Massie was still conversing with Mother, she had Mother's CPS history searched, revealing the following:

- In May 2020, the Department received a referral for neglectful supervision regarding one of Mother's other children. At the time, Mother was in a relationship with J.E. Law enforcement responded to a

3

domestic disturbance at Mother's residence, where they found Mother arguing with J.E. Mother grabbed a kitchen knife, locked herself in her room, and began cutting herself on the wrist. After Mother received treatment and successfully completed services, the case was closed.

- In September 2020, the Department received a second referral for neglectful supervision regarding Mother. According to the report, Mother punched J.E. in the face, but no arrests were made because it was considered mutual combat. J.G. was home at the time of the violence.

- In April 2021, the Department received a third neglectful supervision referral regarding Mother. According to the report, J.E. and Mother got into a fight, leading to J.E. pulling out a gun and pointing it at Mother's head before firing several shots outside. J.E. then hit Mother in the head with a speaker box and cut her stomach with a knife. This all occurred in J.G.'s presence.

Massie asked Mother why she initially withheld this information, but Mother did not respond. Massie found no evidence of a Nyquil bottle in the hotel room. Massie also confirmed that Mother was not receiving SNAP benefits.

Based on Massie's affidavit, J.G. was removed from Mother's care, and the Department was appointed as J.G.'s temporary managing conservator. In December 2021, a family-service plan was approved by the trial court for Mother. The plan required that she: (1) provide her CPS caseworker with proof of income and stable housing; (2) participate in a domestic-violence assessment and follow all recommendations; (3) participate in all scheduled visits with J.G.; (4) complete a psychiatric and psychosocial assessment; (5) sign a release of information; (6) submit to random drug screenings; and (7) if any drug screenings yielded positive results, participate in a substance-abuse assessment and follow all

4

pertinent recommendations.

*The permanency progress report*

In March 2023, the Department filed a permanency progress report detailing J.G.'s progress during the suit and Mother's participation in her family-service plan. The report included Mother's result from her December 2021 psychosocial assessment, which indicated that Mother's "thought content and thought process appeared to be within normal limits." The assessment included additional observations, such as noting that Mother seemed to be unaware that the level of alcohol she admitted to consuming could affect her ability to safely supervise J.G. The assessment also indicated that Mother took the Adult-Adolescent Parenting Inventory and that "four of her scores were in the high-risk category." Accordingly, the assessment recommended that she participate in a drug-and-alcohol assessment and that she follow all recommendations given as a result of the assessment.

In April 2022, Mother completed a substance-abuse assessment, which recommended individual counseling, group counseling, and random drug testing. Mother attended counseling but was discharged from counseling in June 2022 for "lack of attendance." In early October 2022, Mother was sent back to individual drug-abuse counseling, which she regularly attended through November 2022. In December 2022, she started missing a few appointments, and then she stopped attending completely in January 2023.

The permanency report also indicated that since January 2022, Mother only appeared for two of her drug tests—June and August 2022—and missed all the others. When Mother appeared for testing in June 2022, she tested positive for marijuana and cocaine; in August 2022, she tested positive for marijuana.

5

*Evidence at trial*

Trial commenced in March 2023. The Department's goal was to have J.G. remain with his maternal aunt, but J.G.'s attorney ad litem asked for a 30-day recess, explaining that the aunt was no longer interested in a permanent placement. After the 30-day recess, the Department informed the trial court that the aunt was interested in serving as a permanent placement for J.G.

The Department called Kyle Sanders, the conservatorship caseworker, to testify regarding Mother's overall progress on her family-service plan. Sanders testified that in early 2022, Mother had been enrolled in several services, including individual counseling, substance-abuse group therapy, and substance-abuse individual counseling. However, in June 2022, Mother was removed from those services for lack of attendance. She began again in October but was again removed in early January 2023 for lack of attendance.

Sanders confirmed that Mother was largely noncompliant in submitting to drug testing. He testified that he even offered to drive her to some of the drug tests, but every time he tried, "[s]he would become unavailable." He further described Mother's visitation with J.G. as "spotty"; sometimes she would show up multiple times a month, but other months she would not show up at all. Although Mother completed her psychological evaluation in September 2022, Sanders testified that the Department had no knowledge of the results of the evaluation until January 2023. The evaluation indicated that Mother's IQ was in the 50s, which is significantly below average. However, Sanders testified that Mother was able to easily express herself, did not appear to have difficulty understanding what was being asked of her, and expressed understanding by asking clarification questions.

Sanders testified that Mother never completed her domestic-violence assessment. The Department was concerned with Mother's history of domestic

violence and her refusal to address the domestic-violence concerns.

Mother, via video conference, testified that she now lives with her sister and works as a painter, but she also admitted she did not complete the parenting classes or substance-abuse classes. When asked why she had not completed most of her services, she responded, "I can't answer that question, ma'am. I'm sorry." Mother also asserted that working multiple services simultaneously was difficult for her; when asked to clarify, Mother explained, "[s]ometimes I couldn't pay off my phone. Sometimes it was just difficult for me."

When Mother mentioned that the father of her other child had passed away, the attorney ad litem asked Mother how he had died. After the trial court overruled Mother's objection, Mother stated, "You know what? I give up on this. Y'all keep my kid. I don't care anymore. Bye. Keep the kids." Mother immediately logged off of the video conference; the trial continued without her.

Tranasha Gibbs, the conservatorship supervisor, testified that Mother had ample opportunity to complete her services. She testified that the Department made all the necessary referrals for Mother to complete the services, and that if Mother had requested accommodations, the Department would have tried to assist her.

The trial court made the predicate findings to terminate Mother's parental rights to J.G. pursuant to subsections (E) and (O) and found that terminating her rights was in J.G.'s best interest. Tex. Fam. Code Ann. § 161.001(b)(1)(E), (O). Mother filed a timely notice of appeal.

## II. ANALYSIS

### A. Standards of review

Due to the severity and permanency of terminating the parental relationship, the law in Texas requires clear-and-convincing evidence to support such an order.

*See* Tex. Fam. Code Ann. § 161.001(b); *In re J.F.C.*, 96 S.W.3d 256, 263–64 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *see J.F.C.*, 96 S.W.3d at 264.

The heightened burden of proof in termination cases results in a heightened standard of review. *See J.F.C.*, 96 S.W.3d at 266–67. We review the legal sufficiency of the evidence by considering all evidence in the light most favorable to the finding to determine whether a reasonable fact-finder could have formed a firm belief or conviction that its finding was true. *Id.* at 266. We must assume the fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder could do so, and we disregard all evidence a reasonable fact-finder could have disbelieved or found incredible. *Id.* However, this does not compel us to disregard all evidence that does not support the finding. *Id.* Because of the heightened standard, we are also mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.*

In reviewing the factual sufficiency of the evidence under the clear-and-convincing burden, we consider and weigh all of the evidence, including disputed or conflicting evidence. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *J.F.C.*, 96 S.W.3d at 266. We give due deference to the fact-finder's findings, and we cannot substitute our own judgment for that of the fact-finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam).

## B.    Predicate termination grounds

The trial court made predicate termination findings that Mother had committed acts establishing the grounds set out in subsections (E) and (O) of section 161.001(b)(1), which provides for termination of parental rights if the fact-finder finds by clear-and-convincing evidence that the parent has:

> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

> . . . .

> (O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child[.]

Tex. Fam. Code Ann. § 161.001(b)(1)(E), (O).

Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there also is a finding that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

Due process requires, however, that when a parent has raised the issue of insufficiency of the evidence to support the trial court's findings under Family Code section 161.001(b)(1)(D) or (E), an appellate court must address those endangerment findings to ensure a meaningful appeal due to the collateral consequences of a finding under those subsections. *In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019). Due-process and due-course-of-law requirements also mandate that an appellate court detail its analysis for an appeal of termination of parental

rights under Family Code section 161.001(b)(1)(D) or (E). *Id.* Accordingly, we first address Mother's second issue by reviewing the trial court's endangerment findings under section 161.001(b)(1)(E). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E).

### 1.    Endangerment under subsection (E)

"Endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam); *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). A finding of endangerment under subsection (E) requires evidence that the endangerment was the result of the parent's conduct, including acts, omissions, or failure to act. *S.R.*, 452 S.W.3d at 360. Termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* "While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffers injury; rather, the specific danger to the child's well-being may be inferred from parents' misconduct alone." *Id.* at 360 (citing *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)).

A court may consider actions and inactions occurring both before and after a child's birth to establish a "course of conduct." *In re V.A.*, 598 S.W.3d 317, 331 (Tex. App.—Houston [14th Dist.] 2020, pet. denied). A parent's past endangering conduct may create an inference that the past conduct may recur and further jeopardize the child's present or future physical or emotional well-being. *See S.R.*, 452 S.W.3d at 366–67; *In re M.T.R.*, 579 S.W.3d 548, 568 (Tex. App.—Houston [14th Dist.] 2019, pet. denied). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being

of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

Mother argues there was legally- and factually-insufficient evidence to support a finding under subsection (E). Mother argues that drug use alone cannot support termination under subsection (E). Additionally, she reiterates there is no evidence that she was ever arrested, engaged in criminal behavior, or kept the company of dangerous people. She insists that one incident of alleged neglectful supervision—referring to the night J.G. was found wandering alone at the hotel—cannot be considered a course of conduct that endangered J.G. Although Mother is correct that one incident cannot justify removal, the Department did not rely solely on that night to show a course of conduct. Instead, the evidence, when taken as a whole, demonstrates that Mother engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the physical or emotional well-being of J.G.

The night J.G. was removed from Mother was not an isolated event; it was the fourth time the Department had received a referral for neglectful supervision regarding Mother. All three of the prior referrals involved domestic violence in the presence of J.G. The first referral involved an argument between Mother and J.E., leading to Mother grabbing a kitchen knife and cutting her wrists. The Department received a second referral, approximately four months later, when J.E. and Mother mutually assaulted one another. The third referral came after J.E. pointed a loaded gun at Mother, fired rounds outside, hit Mother in the head, and then cut her stomach with a knife. Mother also acknowledged that J.E. had previously been incarcerated for almost one year due to domestic violence.

In summary, the Department presented clear-and-convincing evidence that Mother engaged in conduct or knowingly placed the child with persons who

engaged in conduct which endangers the physical or emotional well-being of J.G. We conclude that the evidence was legally sufficient to support termination under subsection (E); we also conclude the evidence was not factually insufficient to support termination under subsection (E).

Accordingly, we overrule Mother's second issue.

### 2.  Affirmative defense to subsection (O) finding

In her third issue, Mother argues she proved an affirmative defense to termination under subsection (O). However, because we have concluded the evidence was sufficient to support termination under subsection (E) and only a single predicate ground is necessary to support termination, we need not address Mother's third issue. *See* Tex. Fam. Code Ann. § 161.001(b)(1).

### C.  Affirmative defense under the ADA

In her first issue, Mother argues that the trial court erred by terminating her parental rights because she proved by way of affirmative defense that she has a disability and that the Department discriminated against her in violation of her rights under the ADA. *See* 42 U.S.C. § 12132. However, Mother never actually explained to the trial court what disability she had, what accommodations were necessitated by her disability, or what specific provisions of the ADA were violated. And the record does not reflect that she requested accommodations. Therefore, we conclude that Mother has not preserved this complaint for appellate review. Tex. R. App. P. 33.1(a)(1).[4]

---

[4] We also note that to the extent that Texas appellate courts have recognized alleged ADA violations as an affirmative defense in termination proceedings, such an affirmative defense is only relevant to termination under subsection (O). *See, e.g., J. G. v. Tex. Dep't of Family & Protective Servs.*, No. 03-22-00790-CV, 2023 WL 3634364, at *7 (Tex. App.—Austin May 25, 2023, no pet.). Thus, the Department's alleged violations of Mother's rights under the ADA would have no effect on the trial court's subsection (E) finding, which we upheld above.

**C. Best interest of the child**

**1. Legal standard**

In her fourth issue, Mother challenges the factual sufficiency of the evidence to support the trial court's finding that termination of her parental rights is in the best interest of J.G.[5] *See* Tex. Fam. Code Ann. § 161.001(b)(2).

There is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam) (citing Tex. Fam. Code Ann. § 153.131(b)). However, prompt and permanent placement of children in a safe environment is also presumed to be in the children's best interest. Tex. Fam. Code Ann. § 263.307(a). The considerations the fact-finder may use to determine the best interest of the children, known as the *Holley* factors, include:

(1) the desires of the child;

(2) the present and future physical and emotional needs of the child;

(3) the present and future physical and emotional danger to the child;

(4) the parental abilities of the person seeking custody;

(5) the programs available to assist the person seeking custody in promoting the best interest of the children;

(6) the plans for the child by the individuals or agency seeking custody;

(7) the stability of the home or proposed placement;

(8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and

(9) any excuse for the parent's acts or omissions.

*See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also* Tex. Fam.

---

[5] Mother does not challenge the legal sufficiency of the evidence that termination was in J.G.'s best interest.

Code Ann. § 263.307(b) (listing factors to be considered in evaluating "whether the child's parents are willing and able to provide the child with a safe environment"). A best-interest finding does not require proof of any unique set of factors or limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371–72.

In reviewing the sufficiency of the evidence to support the trial court's finding on best interest, we are mindful the focus in a best-interest analysis is not only on the parent's acts or omissions, but also on the nature of the relationship the children have with the parent. *See In re E.N.C.*, 384 S.W.3d 796, 808 (Tex. 2012).

### 2. Sufficiency of the evidence

#### a. Desires of the child

J.G. was too young at the time of the trial to express any desires. Under these circumstances, the fact-finder may consider with whom the child has bonded, whether the child is receiving good care in that placement, and whether the child has spent minimal time with a parent. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). The Department concedes that at the time of trial, J.G.'s only bonds were with Mother's biological family members and that a permanent placement for J.G. had not been secured. The record also demonstrates that J.G. was receiving good care from his aunt.

We conclude this factor weighs against termination.

#### b. Physical and emotional needs of the child

Evidence of a parent's unstable lifestyle can support a fact-finder's conclusion that termination of parental rights is in the child's best interest. *In re S.B.*, 207 S.W.3d 877, 887 (Tex. App.—Fort Worth 2006, no pet.). Lack of stability, including a stable home, supports a finding that the parent is unable to provide for a child's emotional and physical needs. *See In re G.M.G.*, 444 S.W.3d

46, 60 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *see also Doyle v. Tex. Dep't of Protective & Regulatory Servs.*, 16 S.W.3d 390, 398 (Tex. App.—El Paso 2000, pet. denied) (parent's failure to provide stable home and provide for child's needs may contribute to finding that termination of parental rights is in child's best interest).

Mother had no job when J.G. was initially removed, but at the time of trial, Mother testified that she worked as a painter. However, the record reflects that in the six months preceding trial, Mother had moved three times. Mother also acknowledged that at the time of the trial, she lived with her sister and that if J.G. were returned to her at that time, there was no room for J.G. The record also demonstrated that Mother failed to complete parenting classes offered to her.

Overall, this factor weighs in favor of terminating Mother's rights.

### c. Parenting abilities

It is true, as Mother asserts, that no testimony exists alleging her behavior was inappropriate during her visits with J.G. However, there were concerns about Mother's treatment of J.G. when he was found wandering around the hotel. The Department's investigator averred that after J.G. began crying, she tossed him on a chair, and then failed to engage with him throughout the investigation.

In discussing her results on the Adult-Adolescent Parenting Inventory, the "parenting skills" section of her psychosocial assessment indicated that one of her scores was in the medium-risk category and four were in the high-risk category. Her scores included the following notes:

B)    **Low Level of Empathy (1):** . . . Lacks nurturing skills. May be unable to handle parenting stresses.

. . .

D)    **Reverses Family Roles (1):** Tends to use children to meet

self-needs. Children perceived as objects for adult gratification. . . .

As indicated above, Mother did not attend the parenting classes the Department made available to her. She also did not complete her domestic-violence assessment. And on the last day of trial, Mother became overwhelmed and logged out of the video conference, exclaiming, "I give up on this. Y'all keep my kid. I don't care anymore. Bye. Keep my kids."

These facts strongly support termination.

### d.  Current placement and the Department's plan for J.G.

J.G. was placed with his maternal aunt for most of the time between his removal from Mother and trial. The Department's original plan was to keep J.G. with the maternal aunt if J.G. could not be reunited with Mother. As trial began, it was revealed that the aunt was not interested in a permanent placement. After a one-month recess, the caseworker explained the aunt's final position:

> [The aunt is] concerned that people aren't being caring enough about her stances, her positions, and her needs in the situation. She said that she's unable to keep [J.G.] long-term, that she made it clear to everybody that long-term placement with her was not her goal at all. She asked if we could potentially do the paperwork in her boyfriend's name . . . so if they ever broke up, [J.G.] could just go with him so she's not on the hook in the event another case [got] called in.

Sanders testified that the Department believed termination was in J.G.'s best interest because the aunt's response was "unacceptable" for the caregiver of a three-year old and there were no other viable family members to take care of J.G.; thus, they needed to terminate Mother's rights so that J.G. could find a permanent home. A reasonable fact-finder could conclude that the Department's plan for J.G. was his best chance for finding a permanent placement with the resources and active interest in caring for him long-term.

This factor weighs in favor of termination.

### d.    Endangerment

We have already concluded that Mother's pattern of conduct endangered J.G. such that termination was appropriate. J.G. was repeatedly exposed to domestic violence. Mother had no home of her own, had moved three times in six months, and admitted to there not being room for J.G. where she was staying at the time of trial, all of which subjected J.G. to instability and uncertainty.

### e.    Mother's family-service plan

The record shows that Mother failed to appear for numerous drug tests. *In Interest of E.R.W.*, 528 S.W.3d 251, 265 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("[A] fact finder reasonably can infer that a parent's failure to submit to court-ordered drug tests indicates the parent is avoiding testing because they were using illegal drugs."). Likewise, even though the record demonstrated that she appeared for numerous visits with J.G., she also missed numerous appointments. Mother's attendance for substance-abuse counseling and therapy was similarly inconsistent; she was discontinued from those services for lack of attendance, resent to those services, and then once again discontinued for lack of attendance.

Mother's lack of interest or inability to prioritize services required for reunification weighs in favor of the trial court's finding that termination was in J.G.'s best interest.

### f.    Excuses for Mother's acts and omissions

Mother complains that the Department did not adequately accommodate her and her disability. However, as discussed above, the record does not reflect that Mother ever informed the Department of her disability or requested any form of accommodation. When asked why she had not completed her services, Mother

17

responded, "I can't answer that question, ma'am. I'm sorry." Without much clarification, she asserted that doing multiple services simultaneously was difficult. When asked if there was a reason why she could not have worked on completing her services one at a time before focusing on the next service, she responded, "It's hard to concentrate." After Mother proclaimed she is doing a "great job" of being a mom, she admitted that none of her children are currently in her care or live with her. The attorney ad litem asked if this is something that happens to a person who is a great mom, and Mother responded, "I can't answer you—it's [my] lot in life."

We conclude this factor weighs in favor of termination.

### g.      Summary

Considering and weighing the disputed evidence contrary to the best-interest determination against all the evidence favoring the best-interest determination, giving due deference to the trial court's findings, and after an exacting review of the entire record with a healthy regard for the constitutional interests at stake, we conclude the evidence is such that a fact-finder could reasonably form a firm belief or conviction that termination of Mother's parental rights was in J.G.'s best interest. *J.F.C.*, 96 S.W.3d at 266. Thus, the evidence is not factually insufficient regarding the trial court's best-interest determination. *Id.*

We overrule Mother's fourth issue.

## D.      Possessory conservatorship

In her fifth issue, Mother asserts the trial court abused its discretion by not appointing Mother as the possessory conservator.

We review a trial court's appointment of a non-parent as sole managing conservator for an abuse of discretion and reverse only if we determine that the appointment is arbitrary or unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex.

18

2007). When the parents' rights are terminated, section 161.207 controls the appointment of a managing conservator. *See* Tex. Fam. Code Ann. § 161.207(a). Section 161.207 states, "[i]f the court terminates the parent-child relationship with respect to both parents or to the only living parent, the court shall appoint a suitable, competent adult, the [Department], or a licensed child-placing agency as managing conservator of the child." *Id.*

Having found the evidence sufficient to support the trial court's subsection (E) and best-interest findings, we conclude the trial court did not abuse its discretion in appointing the Department as J.G.'s sole managing conservator.

We overrule Mother's fifth issue.

## III.   CONCLUSION

We affirm the final order as challenged on appeal.

/s      Charles A. Spain
Justice

Panel consists of Justices Jewell, Spain, and Wilson.

19